# STATE v. ROBERT CRAIGE PIETRASZEWSKI.

172 N. W. (2d) 758.

November 21, 1969—No. 42033.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *William B. Randall,* County Attorney, and *Paul E. Lindholm,* Assistant County Attorney, for appellant.

*Theodore J. Collins,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal by the state pursuant to Minn. St. 632.11, subd. 1(3), from rulings made at a Rasmussen hearing suppressing certain evidence of the state.

On February 14, 1969, defendant, Robert Craige Pietraszewski, was indicted by the Ramsey County grand jury for first-degree murder on account of the death of Susan Marek, which occurred in St. Paul, Minnesota, some time during the evening of February 5, 1969, or the morning of February 6, 1969. At the hearing to determine the admissibility of certain of the state's evidence, the trial court ruled that the following evidence should be suppressed: (1) Writings made by defendant which were taken from defendant's home during the course of a search made pursuant to a search warrant, which writings had not been specified in the search warrant; (2) testimony of officers relative to the contents of the writings found in defendant's home; (3) defendant's automobile taken pursuant to the search warrant; (4) a roll of white tape taken from defendant's home pursuant to the search warrant; and (5) papers of defendant taken from the jail cell out of which defendant had recently been moved subsequent to a disturbance involving him. It is the state's contention that these rulings were erroneous and should be reversed.

On February 6, 1969, the partially nude body of Susan Marek was found at the Duluth-Case playground in St. Paul. After some investigation, the defendant came under suspicion and a search

warrant was issued by a magistrate on the evening of February 7, 1969. The affidavit upon which the issuance of the search warrant was based contained in essence the following allegations: That Susan Marek had been raped and beaten to death and that her body contained multiple cuts, bruises, and grease spots, her skull was fractured, and her hands were bound with white surgical tape; that it appeared she had been bludgeoned with what would match the description of a tire iron and that her body had either been dragged or run over by a car; that the last time Susan was seen alive was at 11:45 p. m., February 5, 1969, at which time she was babysitting for one Jackie Hodgin, who was at a bar near her home where she saw an occasional boy friend of hers, Robert Pietraszewski, who lives at 1029 East Cook, St. Paul; that he left the bar at 11 o'clock the night of February 5, 1969, and said he would return later to get Jackie Hodgin, who also left later and did not see him again; that during the summer of 1969, Pietraszewski dated Jackie Hodgin several times, at which times Susan Marek was used exclusively as Jackie Hodgin's babysitter; and that Pietraszewski had met Susan on two or three occasions and knew she was Jackie's babysitter.

The affidavit further stated that about 11:45 p. m., February 5, 1969, one Charles Mulvaney was speaking to Susan Marek on the telephone and was told by her that a friend of Jackie Hodgin's was at the door and wanted her to assist in getting Jackie in the house because she was drunk; that Mulvaney called back several times that night but got no response; that Pietraszewski had parked several times with Jackie Hodgin at the playground where Susan Marek's body was found and had stated that it was one of his favorite places because of its seclusion; that St. Paul Police Department records show that in July 1968 Pietraszewski had been identified as one who greatly resembled a man who had raped a 12-year-old girl who had been abducted while babysitting; that a license check at the Minnesota State Capitol reveals that Pietraszewski owns a 1965 Ford convertible, Minnesota license number MHZ 155; and that the af-

fiant's petition for a search warrant was made upon information received from other law-enforcement agents and information resulting from his own investigation.

The warrant authorized the search of defendant's car and home and seizure of the car, a knife, surgical tape, a jacket with the letter "H," and a tire iron. Pursuant to the search warrant, defendant's home was searched and his car was impounded and searched. At the time of the search of the home, defendant was not there but his mother admitted the police. During this search, the officers found a jacket with the letter "H," one partial roll of Johnson-Johnson 1-inch white adhesive tape, and some papers which contained written statements made by defendant. The papers were found folded into a small ball underneath some pocket novels in an open-faced bookcase. The officers seized the jacket, the tape, and some of the papers which they found. The other papers were copied by an officer and the copies were taken. They receipted and inventoried only the jacket and the tape and told defendant's mother that they had not taken any of the papers which were found.

Defendant was arrested February 11, 1969, and remained in jail because of his inability to raise the necessary bail.

While in jail, on May 17, 1969, defendant was involved in a disturbance with one of the jailers, as a result of which he was moved to another cell. Later that day, defendant requested that one of the jailers, Richard Corbo, bring him a McCall's magazine which he had left in his former cell. When Corbo got the magazine, he noticed that it contained a thick sheaf of papers, which he looked through, following a jail practice to search a prisoner's property when the prisoner is moved. This search disclosed several writings which Corbo thought might be of some importance in this case, and he turned them over to the chief jailer.

At a hearing to determine the admissibility of the evidence obtained during the search of defendant's home and automobile and of the evidence obtained from defendant's former jail cell,

the trial court made the following rulings: The writings found in defendant's home during the search pursuant to the warrant were inadmissible because they were not specified in the search warrant; the testimony of officers relating to the contents of such statements was suppressed on the basis that if the writings themselves are inadmissible, any secondary evidence of their contents should also be inadmissible; the automobile and surgical tape taken pursuant to the search warrant were suppressed because the affidavit accompanying the petition for the search warrant was insufficient to support a finding of probable cause with respect to them (the affidavit was held sufficient to support probable cause with respect to the jacket); the papers taken from defendant's former cell were suppressed by the trial court because both the papers and the magazine were defendant's property and, as such, they were protected by the Fourth Amendment even though defendant was in jail.

1. A search warrant may be granted only upon a showing of probable cause "supported by oath or affirmation." The determination that probable cause exists must be made by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U. S. 10, 14, 68 S. Ct. 367, 369, 92 L. ed. 436, 440. In order to permit the magistrate to make this determination, he must be provided with the relevant facts.

2. In the instant case, the only facts presented to the magistrate were those in the affidavit and petition for the search warrant. Consequently, the facts presented in the affidavit and petition must be sufficient to permit the magistrate to independently judge whether or not probable cause exists. In that connection, the United States Supreme Court in Aguilar v. Texas, 378 U. S. 108, 84 S. Ct. 1509, 12 L. ed. (2d) 723, and more recently in Spinelli v. United States, 393 U. S. 410, 89 S. Ct. 584, 21 L. ed. (2d) 637, has established a two-part standard by which a reviewing court can determine whether the facts presented to the mag-

istrate were sufficient to permit him to make the necessary independent judgment. First, facts which led the affiant to conclude that there was probable cause for a search must be presented in sufficient detail to permit the magistrate to make an independent determination as to the existence of probable cause. Second, the magistrate must be presented with the affiant's source of information, and where, as in this case, the source is other than personal observation, additional facts must be presented on which the magistrate can independently judge the reliability of the source. We have applied this test in State v. Burch, 284 Minn. 300, 170 N. W. (2d) 543, and State v. Miernik, 284 Minn. 316, 170 N. W. (2d) 231.

In United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. ed. (2d) 684, it was held that where an affidavit for a search warrant details the underlying circumstances upon which is based a belief that probable cause exists, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical rather than a commonsense manner, and should resolve doubtful or marginal cases according to the preference to be accorded to warrants.

After examining and considering the affidavit in the present case, we conclude that it sets forth facts which, when construed together, provide a sufficient factual basis to permit the magistrate to make an independent judgment, both as to the existence of probable cause to search for the specified property and as to the reliability of the sources of information. We also conclude that the facts presented in the affidavit were sufficient to support the finding of probable cause, and we therefore hold that the search warrant authorizing the search of the defendant's home and car for the specified property had a constitutionally adequate basis.

It is our opinion that the trial court's ruling that the search warrant did not authorize the seizure of a roll of white adhesive

tape because the warrant specified surgical tape is too technical and limited under the circumstances here, especially in view of the fact the affidavit set out that Susan's hands were bound with white surgical tape. We think the seizure was justified.

For the foregoing reasons we hold that the tape and the car should not have been suppressed as evidence.

3.   We cannot agree with the state's contention that the suppression of the writings found in defendant's bedroom should be reversed. In State v. Mastrian, 285 Minn. 51, 171 N. W. (2d) 695, we held that if an infringement of a person's Fourth Amendment rights is challenged, the infringement becomes presumptively invalid, and the burden is on the state to justify it as one which is not violative of the Fourth Amendment guaranty against invasion of privacy. It is settled law that general searches are unconstitutional, and that a search pursuant to warrant does not entitle the executing officer to engage in a general search under the guise of a search warrant. Marron v. United States, 275 U. S. 192, 48 S. Ct. 74, 72 L. ed. 231. While it is sometimes permissible to seize things other than those described in the search warrant, the state, when challenged as here, must demonstrate a reasonable relationship between the search authorized by the search warrant and the seizure of the thing not described. United States v. Joseph (E. D. Penn.) 174 F. Supp. 539, affirmed (3 Cir.) 278 F. (2d) 504; United States v. Alloway (6 Cir.) 397 F. (2d) 105; Gurleski v. United States (5 Cir.) 405 F. (2d) 253. The trial court was justified in its conclusion that the state failed to sustain this burden with respect to the writings found in defendant's bedroom. See, State v. Mastrian, *supra.*

4.   The state argues that it should be permitted to have the police officers who conducted the search testify as to the contents of the papers found in defendant's bedroom if the papers themselves cannot be introduced. We cannot agree with the state's contention. The purpose of the exclusionary rule is to deter violations of constitutional guaranties by removing the incentive to

disregard those guaranties. The state cannot indirectly benefit from an illegal search by producing secondary evidence gained as a result of such a search. McGinnis v. United States (1 Cir.) 227 F. (2d) 598; Wong Sun v. United States, 371 U. S. 471, 485, 83 S. Ct. 407, 416, 9 L. ed. (2d) 441, 454. Thus, it follows that the state cannot be permitted under the circumstances here to benefit from an illegal search by introducing the testimony of officers as to the contents of the papers if the papers themselves are inadmissible.

5. Finally, the state contends that the ruling made by the trial court suppressing the writings taken from defendant's former cell was erroneous. We agree. While it is true that the Fourth Amendment to the United States Constitution provides protection against unreasonable searches, this does not mean that the custodian of a jail cannot search prisoners and their cells without a search warrant based upon probable cause. For obvious reasons, a jail cannot be equated with a man's home in claiming the right to privacy. The United States Supreme Court said in Lanza v. New York, 370 U. S. 139, 143, 82 S. Ct. 1218, 1220, 8 L. ed. (2d) 384, 387:

"* * * [T]o say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument."

We feel that the search of an inmate of a penal institution is authorized by implication as reasonably necessary in the fulfillment of the custodian's duties to maintain jail security, to preserve order and discipline, to insure the safety of the inmates and guards, and to see that the inmates conduct themselves in a reasonable manner. Therefore, the written statements taken from defendant's former cell were not obtained by means of unreasonable search and, in our opinion, should not be constitutionally objectionable as evidence.

In addition to the foregoing issues raised by the state, de-

fendant asks the court to rule on two other issues. However, review of the trial court's rulings that evidence obtained by the state was not obtained in violation of defendant's constitutional rights is not permitted by Minn. St. 632.11. State v. King, 279 Minn. 225, 156 N. W. (2d) 742. Thus, defendant has no present right to appeal.

Respondent is allowed $150 attorneys' fees in this court. Minn. St. 632.13(8).

Reversed in part and affirmed in part.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.